IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, and<br>COMMONWEALTH OF VIRGINIA, *ex rel.*<br>Megan L. Johnson, Leslie L. Webb, and<br>Kimberly Stafford-Payne,<br><br>v.<br><br>UNIVERSAL HEALTH SERVICES, INC.,<br>KEYSTONE EDUCATION AND YOUTH<br>SERVICES, LLC, and KEYSTONE<br>MARION, LLC, d/b/a MARION YOUTH<br>CENTER,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:07-CV-000054<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AMENDED COMPLAINT

The United States of America and the Commonwealth of Virginia ("Commonwealth")

bring this action against Defendants Universal Health Services, Inc. ("UHS"), Keystone

Education and Youth Services, LLC, ("Keystone Education"), and Keystone Marion, LLC, d/b/a

Keystone Marion Youth Center ("KMYC"), to recover federal and state losses sustained by the

Virginia Medical Assistance Program ("VMAP"), also known as Virginia Medicaid.

## NATURE OF ACTION

1.      The United States brings this action to recover treble damages and civil penalties

under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33.

2.      The Commonwealth brings this action to recover treble damages and civil

penalties under the Virginia Fraud Against Taxpayers Act ("VFATA"), Va. Code Ann. §§ 8.01-

216.3(A)(1) and (2), and to recover damages under the Virginia Fraud Statute, Va. Code Ann. §

32.1 – 312(A)(1) and (2).

1

## JURISDICTION AND VENUE

3.       This Court has subject matter jurisdiction over the claim of the United States

pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).  This Court has supplemental

jurisdiction to entertain the claims of the Commonwealth of Virginia pursuant to 28 U.S.C.

§ 1367(a) and 31 U.S.C. § 3732(b).

4.       This Court has venue over these claims under 31 U.S.C. § 3732 and 28 U.S.C.

§§ 1391(b) and (c), in that Defendants transacted business, or the acts underlying this action

occurred, in the Western District of Virginia.

## THE PARTIES

5.       Plaintiffs are the United States on behalf of its agencies or instrumentalities

including the Department of Health and Human Services and the Center for Medicaid Services,

and the Commonwealth of Virginia.

6.       Relators Megan L. Johnson, Leslie L. Webb, and Kimberly Stafford-Payne were

employed as unlicensed therapists at KMYC.

7.       Defendant UHS is a Delaware corporation headquartered in King of Prussia,

Pennsylvania, and is self-described as "one of the largest investor-owned healthcare management

companies."  UHS purchased Defendants Keystone Education and Keystone Marion, LLC, d/b/a

KMYC, in approximately October 2005, and became the owner of KMYC.

8.       Defendant Keystone Education is a Tennessee corporation headquartered in

Nashville, Tennessee.  UHS took over Keystone Education's facilities where it housed UHS's

regional office and UHS's Central Billing Office ("CBO"), both supervised and staffed by UHS

employees.

9.      Defendant Keystone Marion, LLC, is located at 225 Main Street, Marion, Virginia, and purports to operate KMYC as a level C residential treatment facility providing inpatient psychiatric services to patients under the age of 21.

### STATUTES AND REGULATIONS

#### The Medicaid Program

10.     The Medicaid Program, as enacted by Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, *et seq.*, is a joint federal-state program that provides health care benefits for certain groups, primarily indigent and disabled individuals.  The federal Medicaid statute establishes the minimum requirements for state Medicaid programs to qualify for federal funding.  42 U.S.C. § 1396a.

11.     The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).  During all relevant times, the FMAP for the Commonwealth of Virginia was approximately 50 percent.

12.     The Medicaid statute requires each participating state to implement and administer a state plan for medical assistance services which contains certain specified minimum criteria for coverage and payment of claims.  42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A).

#### Applicable State and Federal Laws and
#### Department of Medical Assistance Services Administrative Policies and Procedures

13.     At all times relevant to this Amended Complaint, Defendants' officers, managers, and employees knew that the confinement of Medicaid children at KMYC was governed by provider agreements with the Virginia Department of Medical Assistance Services ("DMAS"), which provided that in operating KMYC, Defendants' "agree[] to comply with all applicable

state and federal laws, as well as administrative policies and procedures of DMAS as from time to time amended," and that failure to comply with these requirements would result in the denial of prior authorization for the confinement of Medicaid children at KMYC and the denial of payment of claims related to such confinement.  This provision was part of agreements entered into on October 15, 2004, by KMYC's previous owner, and on February 6, 2007, and July 16, 2007, by Defendants.

14.  The applicable state and federal laws, as well as administrative policies and procedures of DMAS included those set forth in Federal regulations at 42 C.F.R. Part 441, Subpart D (42 C.F.R. § 441.150, *et seq.*), the Commonwealth's regulations at 12 VAC 30-130-860, and the DMAS Psychiatric Services Provider Manual ("PSPM").  Among these requirements were:

a.     Physician supervision.  Each Medicaid child's treatment must be supervised by professionals that included a physician.  42 C.F.R. § 441.151(a)(1).

b.     Active treatment.  Each Medicaid child must receive active treatment through the implementation of a professionally developed and supervised individual plan of care.  Services must include, but are not limited to, assessment and evaluation, medical treatment (including drugs), individual and group counseling, and family therapy necessary to treat the child.  The active treatment must be designed to serve the mental health needs of each child, and, to be reimbursed, the facility must provide active mental health treatment beginning at admission and it must be related to the child's principle diagnosis and admitting symptoms.  These services could not include interventions and activities designed only to meet the supportive non-mental health special needs, including but not limited to personal care, habilitation or academic educational needs of the child.

4

Medicaid payment for inpatient psychiatric services was not available for inpatient stays during which active treatment, according to the goals and objectives related to the individual's diagnostic needs, was not provided.  42 C.F.R. § 441.154; 12 VAC 30-130-860(B) and (D); PSPM, Ch. IV, at pp. 6, 13 (2004); PSPM, Ch. IV, at pp. 5, 10 (2007).

The PSPM further specified that:

> The active treatment plan must relate to the admission diagnosis and reflect *all of the following*:
>
> (a) A licensed professional (psychiatrist, clinical psychologist, licensed clinical social worker, licensed professional counselors, or clinical nurse specialist-psychiatric with education and experience with children and adolescents) provides individual therapy three out of seven days;
>
> (b) A minimum of 21 distinct sessions (excluding individual treatment, school attendance, and family therapy) of appropriate treatment interventions are provided each week (i.e., group therapy, with specific topics focused to patient needs; insight-oriented and/or behavior modifying). Play/art/music therapy, occupational therapy, and physical therapy may be included; however; these modalities of treatment must not be the major treatment modality;
>
> * * *
>
> (d) Active treatment and comprehensive discharge planning for aftercare placement and treatment must begin at admission.

PSPM, Ch. IV, at p. 15 (2004); PSPM, Ch. IV, at p. 12 (2007) (emphasis in original).

c.     Treatment planning.  Each child must have an individual plan of care based on a diagnostic evaluation, developed by a treatment team of professionals that included a physician, in consultation with the child, and his parents, legal guardians, or others in whose care he would be released after discharge.  The plan must state treatment

5

objectives, prescribe an integrated program of therapies, activities, and experiences designed to meet the treatment objectives, and include, at an appropriate time, post-discharge plans and coordination of inpatient services with partial discharge plans and related community services to ensure continuity of care with the recipient's family, school, and community upon discharge.  42 C.F.R. § 441.155(b); PSPM, Ch. IV, at p. 4-5 (2004); PSPM, Ch. IV, at p. 4 (2007).

d.      Treatment plan review.  Each child's individual plan of care must be reviewed every 30 days by the treatment team, including a physician, to determine that services being provided are or were required on an inpatient basis, and to recommend changes in the plan as indicated by the child's overall adjustment as an inpatient. 42 C.F.R.  § 441.155(c).

e.      Restraints and seclusion.  Each child has the right to be free from restraint or seclusion, of any form, used as a means of coercion, discipline, convenience, or retaliation.  42 C.F.R. § 483.356(a).  Each residential treatment facility providing inpatient psychiatric services to children must attest, in writing signed by the facility director, that the facility is in compliance with federal standards governing the use of restraint and seclusion.  42 C.F.R. § 483.374(a)(1).  A Medicaid provider must meet this requirement at the time it executes a provider agreement with the Medicaid agency. 42 C.F.R. § 483.374(a)(2).

6

### The "Prior Authorization" Requirement

15.     For each Medicaid child admitted to, or continued in, confinement at KMYC,

Defendants were required to request prior authorization from WVMI or KePRO, respectively.

Such prior authorization requests would only be approved if KMYC showed that the

confinement complied with all applicable state and federal laws, as well as administrative

policies and procedures of DMAS, including those described in paragraph 14 above and the

following:

> Intensity of Treatment:  *All of the following services must be provided in order to meet continuing stay criteria:*
>
> 1.     The multidisciplinary recipient-specific treatment plan must be updated every thirty (30) days.  It must include recipient-specific long- and short-term goals, measurable objectives, and interventions with time frames for achievement; the treatment plan must be revised to address goals achieved, unresolved problems, and any new problems which have arisen;
>
> 2.     Services must continue to require the supervision of a physician; and
>
> 3.     Integrated program of therapies including milieu therapy, activities, and experiences designed to meet the treatment objectives; active provision of interventions including individual, group, and, if applicable, family therapy as required . . . .

PSPM, Ch. IV, at p. 16 (2004); PSPM, Ch. IV, at pp. 13-14 (2007) (emphasis in original).[2]

16.     With each request for prior authorization, Defendants were required to submit the

most recent treatment plan (initial plan of care, comprehensive individual plan of care or

"CIPOC," or "CIPOC" 30-day progress update), which WVMI or KePRO relied upon to insure

that each Medicaid child's confinement at KMYC complied with all applicable state and federal

---

[2] The 2007 PSPM added a new paragraph 2 (not cited), and renumbered previous paragraphs 2 and 3 to paragraphs 3 and 4.

laws, and with DMAS' administrative policies and procedures.  Prior authorization approval was required before claims to Virginia Medicaid could be paid or approved for payment.

## **UHS's Claims Processing**

17.     After acquiring Keystone Education and Keystone Marion, UHS took direct control of the claims and billings for services provided at KMYC, and for the receipt of payment for those services.

    a.     UHS established a Central Billing Office ("CBO") in Nashville, Tennessee, staffed by UHS employees, who managed UHS's centralized billing system, referred to as the "Medik" system.  This office was supervised by a UHS employee, Vicki Tench, who held the title of Director, Central Billing Office, and who, along with her staff, corresponded with Virginia Medicaid about claims and payments using letterhead and fax cover sheets bearing the UHS logo and the heading "Universal Health Services, Inc., 3401 West End Avenue Suite #400, Nashville, TN  37203."

    b.     UHS required business office employees at its Virginia facilities, including KMYC, to enter daily room and board charges and other ancillary charges arising from the confinement of Medicaid children into UHS's "Medik" billing system. UHS's CBO used its "Medik" system to generate claims, including the false or fraudulent claims described in this Amended Complaint.  Although the claims stated that they were from "Keystone Marion," the address stated was in Knoxville, Tennessee, and the claims were signed and sent to the Virginia Medicaid claims contractor by Ms. Tench or a member of her staff at UHS's CBO in Nashville, Tennessee.

    c.     UHS's CBO supervised and directed employees at KMYC regarding billing matters.  Employees at KMYC were required to provide UHS's CBO with daily

8

reports of missing billing sheets, reports regarding claims refund issues, weekly billing reconciliations, and reports regarding the posting of late charges.  Although employees located at KMYC transmitted prior authorization requests to WVMI or KePRO for Medicaid children, these employees, in turn, transmitted the prior authorization approval codes to UHS's CBO to be added to the claims prepared, signed, and presented to Virginia Medicaid by the CBO.

        d.      When WVMI or KePRO denied prior authorization approval, employees at KMYC requested reconsideration or appealed such denials using fax cover sheets or letterhead bearing the UHS logo and the header "Universal Health Services, Inc."  These communications were accompanied by false treatment plans, including those described in this Amended Complaint.

        e.      UHS received the proceeds of false claims.  UHS directed Virginia Medicaid to pay for services billed under Keystone Marion's name to a post office box in Atlanta, Georgia.  Ms. Tench was identified as the contact for such payments.

### False Records or Statements

18.     Between approximately October 2005, and an unknown date on or before approximately March 2, 2010, Defendants, through their managers and employees, made, used, or caused to be made or used, false treatment plans to make it appear that KMYC was operated as a residential treatment facility providing inpatient psychiatric services to children in compliance with state and federal laws, and the administrative policies and procedures of DMAS.  In fact, KMYC was operated as a juvenile detention facility, not as a residential treatment facility, in violation of state and federal law, and DMAS' administrative policies and procedures.  The treatment plans falsely stated that:

a.      KMYC provided inpatient psychiatric services under the direction of a licensed psychiatrist, Dr. Alfredo Cervantes, who held the title of medical director, when, in fact, Dr. Cervantes did not provide direction or supervision in planning, implementing, or supervising inpatient psychiatric services and did little more than prescribe medication and sign documents to make it appear that he was providing the required direction or supervision.  In addition, Dr. Cervantes routinely backdated documents, including treatment plans and physician's orders, and signed documents in blank or without otherwise reviewing their contents.

b.      The plans were developed by a treatment team that included Dr. Cervantes, when, in fact, licensed and unlicensed therapists, utilization review personnel, or other untrained employees prepared the treatment plans without direction or supervision from the medical director or other licensed physician.

c.      Treatment plans were based on a diagnostic evaluation that included examination of the medical, psychological, social, behavioral and developmental aspects of the child's situation, when, in fact, the plans were general, standardized, rote language and were not based on the required aspects of each child.

d.      An integrated program of therapies, activities, and experiences designed to meet the treatment objectives of each Medicaid child was prescribed or implemented, when, in fact, treatment plans were copied, standardized, rote forms that were not individualized therapies, activities, and experiences and did not provide an integrated program of therapies, activities, and experiences designed to meet the treatment objectives of each Medicaid child.

e.      KMYC provided or was going to provide active treatment when, in fact, Defendants operated KMYC as a juvenile detention facility that did not provide active treatment and, instead, routinely provided, among other things:

(1)      Unstructured, non-therapeutic activities such as watching television, playing video games, and playing "pick-up" basketball games;

(2)      "Group therapy" sessions conducted for nominal periods of time or not conducted at all, that were documented as full sessions of thirty minutes or more;

(3)      "Individual therapy," also known as "drive-by" therapy, consisting of five-minute interactions in a hallway or public room that were documented as thirty-minute therapy sessions;

(4)      "Therapy" sessions conducted by unlicensed therapists without supervision by a licensed practitioner;

(5)      Substantial periods of time during which Medicaid children were not seen by a psychiatrist or therapist;

(6)      "Provoking," "escalating," applying physical force for the purpose of restraining, and/or medicating for the purpose of chemically restraining Medicaid children to extend their confinement solely for the purpose of increasing claims to, and payments by, the Virginia Medicaid Program.

f.      KMYC provided more than 21 distinct sessions of appropriate therapeutic interventions each week to each Medicaid child when, in fact, few if any sessions of a therapeutic nature were actually provided.

11

g.     Each Medicaid child continued to require confinement at KMYC for inpatient psychiatric services when, in fact, juvenile detention services were provided, and false records or statements were made or used to extend such confinement.

h.     KMYC was operated as a residential treatment facility providing inpatient psychiatric services to Medicaid children when, in fact, it was operated as a juvenile detention facility.

19.     Defendants, through their officers, managers, and employees, knew that false records or statements were provided to WVMI or KePRO, intended that WVMI or KePRO would rely on the false records or statements to approve prior authorization for the initial or continued confinement of Medicaid children at KMYC, and knew that the approval of such prior authorizations would cause DMAS or its payment contractor to approve for payment and pay claims for room and board and other charges related to the confinement of Medicaid children at KMYC.

## False Claims

20.     Between approximately October 2005, and an unknown date on or before approximately March 2, 2010, Defendants, through their managers and employees, knowingly presented, or caused to be presented, to DMAS, false or fraudulent claims for payment of room and board or other charges related to the confinement of Medicaid children at KMYC.

21.     These claims were false or fraudulent in at least one or more of the following three ways:

a.     Virginia Medicaid only covered payments for claims related to the confinement of Medicaid children at KMYC where the confinement was in a residential treatment facility that provided inpatient psychiatric services in compliance with all

12

applicable state and federal laws, and DMAS' administrative policies and procedures.  In fact, Defendants operated KMYC as a juvenile detention facility, failing to comply with the applicable state and federal laws, and DMAS's administrative policies and procedures.  Defendants presented or caused the presentation of claims to DMAS that falsely or fraudulently claimed payment for residential treatment facility room and board at KMYC, when in fact juvenile detention facility room and board was provided.

      b.     Defendants used or caused the use of false treatment plans submitted to WVMI or KePRO to obtain prior authorization approval for the confinement of Medicaid children at KMYC.  UHS's CBO managers and employees prepared and presented claims for room and board for each Medicaid child referencing the fraudulently obtained prior authorization approval codes, thereby incorporating into these claims the false records or statements used to obtain approval of prior authorization.

      c.     Each claim named an "attending physician," and falsely or fraudulently made it appear that treatment and treatment planning was provided under the direction of a licensed psychiatrist when, in fact, neither active treatment nor physician supervision was provided.

## Knowingly

22.    "Knowing" and "knowingly" for purposes of both the FCA and the VFATA, mean that a person, with respect to information (1) has actual knowledge of the information, (2) acts in deliberate ignorance of the truth or falsity of the information, or (3) acts in reckless disregard of the truth or falsity of the information.  Proof of a specific intent to defraud is not required.  31 U.S.C. § 3729(b); Va. Code Ann. § 8.01-216.3(C).

23.    Defendants actions described in this Amended Complaint were knowing as shown by the following facts, among others:

a.    On October 26, 2005, a Business Office Manager at KMYC advised Defendants' managers that compliance with Medicaid billing guidelines was required.

b.    On December 20, 2005, the Business Office Manager at KMYC advised employees at UHS's CBO that certain family therapy billings were not justified and should be refunded to the Virginia Medicaid.  To Plaintiffs' knowledge, Defendants failed to make any such refunds.

c.    On April 18, 2006, Defendants' officers and managers, including UHS Clinical Services Vice President Karen E. Johnson, were told about  "persistent problems in clinical leadership at KMYC during the preceding 18 months," "problems of timeliness and thoroughness" in treatment planning, and "a lot of sloppiness in maintaining a standard way of doing things" in connection with supervision of children confined to KMYC.  No action was taken to address these problems and UHS continued to cause the making and use of false treatment plans to obtain prior authorization for confinement of Medicaid children at KMYC, and continued to present false or fraudulent claims and receive payment for such confinement.

d.    On October 31, 2006, Ms. Johnson and other UHS managers corresponded about KMYC's "enormous problem, still unresolved, with progress notes being completed even after they are identified as missing and reminders were sent to clinician and to supervisors TWICE."  (emphasis in original).

e.    In November 2006, an internal audit report provided to Ms. Johnson and other UHS managers stated that KMYC and other Virginia UHS facilities had

14

deficiencies in the documentation of seclusions and restraints, unsigned plans of care, lack of supervision of unlicensed therapists, and lack of documentation of family therapy.

   f.  On December 26, 2006, the Business Office Manager at KMYC resigned and told  Defendants' managers that Defendants' failure to comply with Medicaid guidelines and regulations during the previous few months resulted in more than 200 room and board charges billed to Virginia Medicaid for services that that were not provided.   To Plaintiffs' knowledge, Defendants did not refund the Virginia Medicaid for these 200 false claims.

   g.  In October 2007, a second internal audit was provided to UHS's officers and managers, again describing deficiencies in the documentation of seclusions and restraints, the review and updating of plans of care, medical record documentation, and documentation of family and other therapy sessions.

## Specific Examples of Defendants' Fraudulent Conduct

24.  For each of the examples stated below, Defendants falsified treatment plans by stating that Dr. Cervantes or another physician supervised the Medicaid child's "treatment," Dr. Cervantes or another physician was a substantial participant on the treatment team, the treatment plans were based on a diagnostic assessment and evaluation, Dr. Cervantes was part of the team that reviewed the treatment plan every 30 days and the reviews reflected the child's overall adjustment and progress during confinement at MYC, and the child was provided active treatment during confinement.

25.  Instead, Dr. Cervantes or another physician did not supervise the child's treatment, did not meaningfully participate on the treatment team, and did not review the treatment plans every 30 days but merely placed his signature on the forms.  The treatment plans

were not based on a diagnostic assessment and evaluation and the child was not provided with active treatment, but instead, Defendants provided juvenile detention involving the frequent and routine use of physical restraints and seclusion, and chemical restraints.

26.     Each treatment plan described in these examples was false as described in paragraph 18 of this Amended Complaint, and was used to obtain prior authorization for confinement of the Medicaid child identified by initials.  Each claim described in these examples was false as described in paragraph 21 of this Amended Complaint, was prepared by UHS's CBO with UHS's "Medik" billing system, was signed by a UHS CBO employee, and was sent by UHS's CBO to Virginia Medicaid.  Each payment described in these examples was received by UHS at its Atlanta post office box under the custody and control of UHS's CBO in Nashville.

### Medicaid Child "AE"

27.     From approximately June 16, 2005, through approximately September 22, 2006, twelve year-old AE was confined to KMYC to receive inpatient psychiatric services.  AE's "treatment" failed to address individualized problems, referral complaints, and psychiatric symptoms, and was exemplified by the absence of psychiatric evaluation, the lack of appropriate family therapy, and the lack of therapy that addressed individualized problems, referral complaints, and psychiatric symptomatology.  The "treatment" or "therapy" provided amounted to observing behavior, collecting data, and creating records for billing purposes, and was exemplified by non-individualized behavior modification like that of a juvenile detention facility, with the focus on "follow directions," "avoid write-ups," "earn points," and other similar non-specific goals.

28.     A representative sample of the false documents made and used, and false or fraudulent claims presented by Defendants in connection with AE's confinement are set forth below:

| Date | Treatment Plan Dates | Confinement Dates Authorized | Date Claim Presented | Dates of Service of False Claim | Date Paid | Amount Paid |
|------|---------|---------|---------|---------|------|------|
| 9/13/05 | 8/12/05-9/7/05 | 9/11/05-12/11/05 | 10/10/05<br>11/7/05<br>12/12/05 | 9/1/05-9/30/05<br>10/1/05-10/31/05<br>11/1/05-11/30/05 | 10/21/05<br>11/18/05<br>12/30/05 | $10,730.10<br>$11,087.77<br>$10,730.10 |
| 12/22/05 | 11/8/05-12/6/05 | 12/12/05-3/11/06 | 1/17/06<br>2/10/06<br>3/7/06<br>4/24/06 | 12/1/05-12/31/05<br>1/1/06-1/31/06<br>2/1/06-2/28/06<br>3/1/06-3/11/06 | 1/27/06<br>2/24/06<br>3/17/06<br>5/5/06 | $11,087.77<br>$11,087.77<br>$10,014.76<br>$3,934.37 |
| 3/11/06 | 2/1/06-2/28/06 | 3/12/06-4/12/06 | 5/25/06 | 3/12/06-3/31/06 | 6/9/06 | $7,153.40 |
| 4/12/06 | 3/1/06-3/28/06 | 4/13/06-7/13/06 | 5/25/06<br>6/8/06<br>7/31/06<br>8/7/06 | 4/1/06-4/30/06<br>5/1/06-5/31/06<br>6/1/06-6/30/06<br>7/1/06-7/13/06 | 6/9/06<br>6/23/06<br>8/11/06<br>8/18/06 | $10,730.10<br>$11,087.77<br>$10,730.10<br>$4,900.74 |

## **Medicaid Child "RH"**

29.     From approximately June 5, 2006, through approximately May 2007, fourteen year-old RH was confined to KMYC for inpatient psychiatric services.   RH's treatment plans did not reflect his adjustment and progress but, instead, involved a pattern of "cutting and pasting" sections from one reporting period to subsequent reporting periods, and included backdated signatures or pre-signed signature pages.  The "treatment" described in his medical records was neither individualized nor therapeutic, exemplified by non-individualized behavior modification with the focus on "get no write-up," "not to instigate," "control anger," "take time," "ignore negativity," "mind your own business," and other similar non-specific goals.

30.     A representative sample of the false documents made and used, and false or fraudulent claims presented by Defendants in connection with RH's confinement are set forth below:

| Date | Treatment Plan Dates | Confinement Dates Authorized | Date Claim Presented | Dates of Service of False Claim | Date Paid | Amount Paid |
|---|---|---|---|---|---|---|
| 6/19/06 | 6/5/06-6/19/06 | 6/5/06-9/5/06 | 7/31/06 | 6/5/06 - 6/30/06 | 8/11/06 | $2,340.00 |
|  |  |  | 8/7/06 | 7/1/06 - 7/31/06 | 8/18/06 | $2,945.00 |
|  |  |  | 9/13/06 | 8/1/06 - 8/31/06 | 9/22/06 | $2,945.00 |
|  |  |  | 10/6/06 | 9/1/06 - 9/5/06 | 10/20/06 | $475.00 |
| 9/1/06 | 7/26/06-8/23/06 | 9/6/06 - 12/4/06 | 2/12/07 | 9/6/06 - 9/30/06 | 2/23/07 | $2,375.00 |
|  |  |  | 4/2/07 | 10/1/06-10/31/06 | 4/13/07 | $2,945.00 |
|  |  |  | 12/13/06 | 11/1/06-11/30/06 | 12/22/06 | $2,850.00 |
|  |  |  | 3/6/07 | 12/1/06-12/4/06 | 3/16/07 | $380.00 |
| 11/30/06 | 10/18/06-11/13/06 | 12/5/06 - 2/2/07 | 3/6/07 | 12/5/06-12/31/06 | 3/16/07 | $2,565.00 |

## Medicaid Child "RS"

31.     From approximately September 26, 2006, through approximately August 29, 2007, thirteen year-old "RS" was confined to KMYC for inpatient psychiatric services.  RS's treatment plans were general, standardized, rote statements, not based on an examination of the medical, psychological, social, behavioral and developmental aspects of RS's therapeutic needs and reflected a pattern of "cutting and pasting" sections from previous 30-day updates.  RS's "treatment" failed to address his individualized problems, referral complaints, and psychiatric symptoms, and was exemplified by non-individualized behavior modification with the focus on "be good," "take time," "ignore the other person," "avoid negativity," "don't get mad," "have positive interactions," "follow staff directions," "stay in assigned area," "listen to teacher," "do work," "avoid PRTs [physical restraint techniques]," "mind your own business," and other similar non-specific goals.

32.     A representative sample of the false documents made and used, and false or fraudulent claims presented by Defendants in connection with RS's confinement are set forth below:

| Date | Treatment Plan Dates | Confinement Dates Authorized | Date Claim Presented | Dates of Service of False Claim | Date Paid | Amount Paid |
|---|---|---|---|---|---|---|
| 9/27/06 | 9/27/06 | 9/26/06-12/24/06 | 11/9/06 | 10/1/06-10/31/06 | 11/24/06 | $11,686.38 |
| | | | 12/13/06 | 11/1/06-11/30/06 | 12/22/06 | $11,309.40 |
| | | | 5/7/07 | 12/1/06-12/24/06 | 5/18/07 | $9,047.52 |
| 3/20/07 | 2/13/07-3/12/07 | 3/25/07-3/31/07 | 5/10/07 | 3/25/07 - 3/31/07 | 5/25/007 | $2,638.86 |
| 6/19/07 | 5/8/07-6/4/07 | 6/23/07 - 7/23/07 | 8/6/07 | 6/23/07 - 6/30/07 | 8/17/07 | $3,015.84 |
| | | | 8/6/07 | 7/1/07 - 7/22/07 | 8/17/07 | $8,650.40 |
| | | | 8/6/07 | 7/23/07 - 7/25/07 | 8/17/07 | $1,179.60 |

## **Other Medicaid Children**

33.    Between approximately October 2005 and March 2, 2010, Defendants made and used numerous other false treatment plans and presented or caused to be presented false or fraudulent Medicaid claims.  Additional examples for other Medicaid children confined to MYC and identified by initials are set forth below.

| Par | Date | Child | Confinement Dates Authorized | Date Claim Presented | Dates of Service of False Claim | Date Paid | Amount Paid |
|---|---|---|---|---|---|---|---|
| 34 | 10/19/05 | BA | 10/18/05-12/8/05 | 11/7/05 | 10/1/05-10/31/05 | 11/18/05 | $11,087.77 |
| | | | | 12/12/05 | 11/1/05-11/30/05 | 12/30/05 | $10,730.10 |
| 35 | 12/9/05 | BA | 12/9/05-3/9/06 | 1/17/06 | 12/1/05-12/31/05 | 1/27/06 | $11,087.77 |
| | | | | 2/28/06 | 1/1/06-1/31/06 | 3/1/06 | $11,087.77 |
| | | | | 6/26/06 | 2/1/06-2/28/06 | 7/7/06 | $10,014.76 |
| 36 | 3/14/06 | BA | 3/10/06-5/10/06 | 4/24/06 | 3/1/06-3/31/06 | 5/5/06 | $11,087.77 |
| | | | | 5/11/06 | 4/1/06-4/30/06 | 5/26/06 | $10,730.10 |
| 37 | 9/29/06 | BA | 8/12/06-9/25/06 | 10/6/06 | 8/12/06-8/31/06 | 1/19/07 | $9,424.50 |
| | | | | 1/3/07 | 9/1/06-9/25/06 | 10/20/06 | $7,539.60 |
| 38 | 11/22/06 | BA | 11/1/06-12/30/06 | 12/13/06 | 11/10/06-11/30/06 | 12/22/06 | $7,916.58 |
| | | | | 2/26/07 | 12/1/06-12/30/06 | 3/9/07 | $11,309.40 |
| 39 | 10/7/05 | CB | 10/5/05-12/5/05 | 11/7/05 | 10/5/05-10/31/05 | 11/18/05 | $2,790.00 |
| | | | | 12/12/05 | 11/1/05-11/30/05 | 12/30/05 | $2,700.00 |
| | | | | 1/17/06 | 12/1/05-12/5/05 | 1/27/06 | $450.00 |
| 40 | 12/16/05 | CB | 12/6/05-2/5/06 | 2/10/06 | 12/6/05-12/31/05 | 2/24/06 | $2,340.00 |
| | | | | 2/10/06 | 1/1/06-1/31/06 | 2/24/06 | $2,790.00 |
| 41 | 2/7/06 | CB | 2/16/06-4/27/06 | 4/24/06 | 2/1/06-2/28/06 | 5/5/06 | $2,790.00 |
| | | | | 5/11/06 | 3/1/06-3/31/06 | 5/26/06 | $2,430.00 |
| | | | | 6/12/06 | 4/1/06-4/27/06 | 6/23/06 | $2,520.00 |
| 42 | 5/10/06 | CB | 4/28/06-6/29/06 | 5/25/06 | 4/28/06-4/30/06 | 6/9/06 | $270.00 |
| | | | | 6/12/06 | 5/1/06-5/31/06 | 6/23/06 | $2,790.00 |
| | | | | 7/31/06 | 6/1/06-6/29/06 | 8/11/06 | $2,610.00 |
| 43 | 6/30/06 | CB | 6/30/06-7/13/06 | 8/7/06 | 6/30/06-6/30/06 | 8/18/06 | $95.00 |
| | | | | 9/25/06 | 7/1/06-7/13/06 | 10/06/06 | $1,235.00 |
| 44 | 12/5/05 | DB | 12/2/05-3/2/06 | 1/17/06 | 12/1/05-12/1/06 | 1/27/06 | $357.67 |
| | | | | 2/10/06 | 12/2/05-12/31/05 | 2/24/06 | $10,730.10 |
| | | | | 2/10/06 | 1/1/06-1/31/06 | 2/24/06 | $11,087.77 |
| | | | | 3/7/06 | 2/1/06-2/28/06 | 3/17/06 | $10,014.76 |

| Par | Date | Child | Confinement Dates Authorized | Date Claim Presented | Dates of Service of False Claim | Date Paid | Amount Paid |
|---|---|---|---|---|---|---|---|
| 45 | 3/9/06 | DB | 3/3/06-6/2/06 | 4/24/06<br>5/11/06<br>7/31/06<br>5/7/07 | 3/1/06-3/31/06<br>4/1/06-4/30/06<br>6/1/06-6/2/06<br>5/1/06-5/31/06 | 5/5/06<br>5/26/06<br>8/11/06<br>5/18/07 | $11,087.77<br>$10,730.10<br>$715.34<br>$11,087.77 |
| 46 | 6/16/06 | DB | 6/3/06-7/5/06 | 4/2/07<br>5/4/07 | 7/1/06-7/5/06<br>6/3/06-6/30/06 | 4/13/07<br>5/18/07 | $1,884.90<br>$10,014.76 |
| 47 | 7/13/06 | DB | 7/6/06-8/5/06 | 8/7/06<br>9/13/06<br>4/2/07 | 7/6/06-7/31/06<br>8/1/06-8/5/06<br>8/5/06-8/5/06 | 8/18/06<br>9/22/06<br>4/13/07 | $9,801.48<br>$1,507.92<br>$376.98 |
| 48 | 8/25/06 | DB | 8/6/06-10/4/06 | 9/13/06<br>10/6/06<br>5/4/07 | 8/6/06-8/31/06<br>9/1/06-9/30/06<br>10/1/06-10/4/06 | 9/22/06<br>10/20/06<br>5/18/07 | $9,801.48<br>$11,309.40<br>$1,507.92 |
| 49 | 10/11/06 | DB | 10/5/06-11/29/06 | 11/9/06<br>5/4/07 | 10/5/06-10/31/06<br>11/1/06-11/14/06 | 11/24/06<br>5/18/07 | $10,178.46<br>$4,900.74 |
| 50 | 12/5/05 | HD | 12/2/05-3/2/06 | 2/10/06<br>2/10/06<br>3/7/06 | 12/2/05-12/31/05<br>1/1/06-1/31/06<br>2/1/06-2/28/06 | 2/24/06<br>2/24/06<br>3/17/06 | $10,730.10<br>$11,087.77<br>$10,014.76 |
| 51 | 3/2/06 | HD | 3/3/06-5/31/06 | 4/24/06<br>5/11/06<br>6/8/06 | 3/1/06-3/31/06<br>4/1/06-4/30/06<br>5/1/06-5/31/06 | 5/5/06<br>5/26/06<br>6/23/06 | $11,087.77<br>$10,730.10<br>$11,087.77 |
| 52 | 7/18/06 | HD | 7/2/06-8/16/06 | 8/29/06<br>9/13/06<br>5/4/07 | 7/2/06-7/31/06<br>8/1/06-8/15/06<br>8/16/06-8/16/06 | 9/8/06<br>9/22/06<br>5/18/07 | $11,309.40<br>$5,654.70<br>$376.98 |
| 53 | 8/11/06 | HD | 8/17/06-9/15/06 | 9/13/06<br>10/6/06 | 8/17/06-8/31/06<br>9/1/06-09/15/06 | 9/22/06<br>10/20/06 | $5,654.70<br>$5,654.70 |
| 54 | 12/11/06 | HD | 10/31/06-11/29/06 | 12/13/06<br>2/26/07 | 11/1/06-11/29/06<br>10/31/06-10/31/06 | 12/22/06<br>3/9/07 | $10,932.42<br>$376.98 |
| 55 | 12/18/06 | HD | 11/30/06-12/29/06 | 2/26/07<br>2/26/07 | 11/30/06-11/30/06<br>12/1/06-12/29/06 | 3/9/07<br>3/9/07 | $376.98<br>$10,932.42 |
| 56 | 2/12/07 | HD | 12/30/06-1/8/07 | 2/26/07 | 12/30/06-12/31/06 | 3/9/07 | $753.96 |
| 57 | 11/2/05 | ZD | 10/20/05-1/20/06 | 3/3/06<br>3/3/06<br>3/3/06<br>3/3/06 | 10/20/05-10/31/05<br>11/1/06-11/30/06<br>12/1/05-12/31/05<br>1/1/06-1/20/06 | 3/17/06<br>3/17/06<br>3/17/06<br>3/17/06 | $4,292.04<br>$10,730.10<br>$11,087.77<br>$7,153.40 |
| 58 | 1/24/06 | ZD | 1/21/06-4/21/06 | 3/3/06<br>3/6/06<br>2/26/07<br>2/26/07 | 1/21/06-1/31/06<br>2/1/06-2/28/06<br>3/1/06-3/31/06<br>4/1/06-4/21/06 | 3/17/06<br>3/17/06<br>3/9/07<br>3/9/07 | $3,934.37<br>$10,014.76<br>$11,087.77<br>$7,511.07 |
| 59 | 4/27/06 | ZD | 4/22/06-7/22/06 | 5/25/06<br>6/8/06<br>2/26/07<br>2/26/07 | 4/22/06-4/30/06<br>5/1/06-5/31/06<br>6/1/06-6/30/06<br>7/1/06-7/22/06 | 6/9/06<br>6/23/06<br>3/9/07<br>3/9/07 | $3,219.03<br>$11,087.77<br>$10,730.10<br>$8,293.56 |
| 60 | 10/27/05 | RD | 10/25/05-11/25/05 | 11/10/05 | 10/25/05-10/31/05 | 11/25/05 | $2,503.69 |
| 61 | 11/1/05 | JD | 11/4/05-11/4/05 | 3/14/06<br>3/14/06 | 10/4/05-10/31/05<br>11/1/05-11/4/05 | 3/24/06<br>3/24/06 | $2,520.00<br>$360.00 |
| 62 | 11/3/05 | JD | 11/5/05-1/29/06 | 12/12/05<br>1/17/06<br>2/10/06 | 11/5/05-11/30/05<br>12/1/05-12/31/05<br>1/1/06-1/29/06 | 12/30/05<br>1/27/06<br>2/24/06 | $2,340.00<br>$2,790.00<br>$2,610.00 |
| 63 | 1/30/06 | JD | 1/30/06-3/30/06 | 2/10/06<br>5/1/06<br>2/26/07 | 1/30/06-1/31/06<br>2/1/06-2/28/06<br>3/1/06-3/30/06 | 2/24/06<br>5/12/06<br>3/9/07 | $180.00<br>$2,520.00<br>$2,700.00 |
| 64 | 4/4/06 | JD | 3/31/06-6/30/06 | 7/31/06<br>8/14/06<br>8/14/06<br>8/14/06 | 6/1/06-6/30/06<br>3/31/06-3/31/06<br>4/1/06-4/30/06<br>5/1/06-5/31/06 | 8/11/06<br>8/25/06<br>8/25/06<br>8/25/06 | $2,700.00<br>$357.67<br>$10,730.10<br>$11,087.77 |

| Par | Date | Child | Confinement Dates Authorized | Date Claim Presented | Dates of Service of False Claim | Date Paid | Amount Paid |
|---|---|---|---|---|---|---|---|
| 65 | 7/10/06 | JD | 7/1/06-8/30/06 | 8/7/06 | 7/1/06-7/28/06 | 8/18/06 | $2,565.00 |
| 66 | 2/3/06 | JE | 1/30/06-2/28/06 | 3/7/06<br>3/7/06 | 1/30/06-1/31/06<br>2/1/06-2/28/06 | 3/17/06<br>3/17/06 | $715.34<br>$10,014.76 |
| 67 | 3/7/06 | JE | 1/30/06-4/30/06 | 4/24/06<br>5/11/06 | 3/1/06-3/31/06<br>4/1/06-4/30/06 | 5/5/06<br>5/26/06 | $11,087.77<br>$10,730.10 |
| 68 | 5/3/06 | JE | 5/1/06-8/1/06 | 6/8/06<br>8/7/06<br>8/29/06<br>9/13/06 | 5/1/06-5/31/06<br>7/1/06-7/31/06<br>6/1/06-6/30/06<br>8/1/06-8/1/06 | 6/23/06<br>8/18/06<br>9/8/06<br>9/22/06 | $11,087.77<br>$11,686.38<br>$10,730.10<br>$376.98 |
| 69 | 11/7/05 | JI | 10/25/05-1/25/06 | 11/22/05<br>12/12/05<br>2/10/06<br>3/27/06 | 10/25/05-10/31/05<br>11/1/05-11/30/05<br>1/1/06-1/25/06<br>12/1/05-12/31/05 | 12/9/05<br>12/30/05<br>2/24/06<br>4/7/06 | $2,503.69<br>$2,700.00<br>$2,250.00<br>$2,790.00 |
| 70 | 6/21/06 | JI | 6/23/06-7/23/06 | 2/26/07 | 7/1/06-7/15/06 | 3/9/07 | $1,330.00 |
| 71 | 8/4/06 | BJ | 7/19/06-10/17/06 | 9/1/06<br>10/6/06<br>11/9/06<br>2/15/07 | 07/19/06-07/31/06<br>09/01/06-09/30/06<br>10/01/06-10/17/06<br>08/31/06-08/31/06 | 9/15/06<br>10/20/06<br>11/24/06<br>3/2/07 | $1,235.00<br>$11,309.40<br>$6,408.66<br>$376.98 |
| 72 | 10/23/06 | BJ | 10/18/06-12/16/06 | 12/13/06<br>1/22/07<br>2/12/07<br>4/2/07 | 11/01/06-11/30/06<br>12/17/06-12/31/06<br>10/18/06-10/31/06<br>12/01/06-12/16/06 | 12/22/06<br>2/2/07<br>2/23/07<br>4/13/07 | $11,309.40<br>$5,654.00<br>$5,277.72<br>$6,031.68 |
| 73 | 11/2/05 | ML | 10/31/05-12/24/05 | 12/13/05<br>1/17/06 | 11/1/05-11/30/05<br>12/1/05-12/31/05 | 12/30/05<br>1/27/06 | $2,700.00<br>$2,790.00 |
| 74 | 12/27/05 | ML | 12/25/05-3/25/06 | 3/10/06<br>4/24/06<br>7/31/06 | 1/1/06-1/31/06<br>3/26/06-3/31/06<br>2/1/06-2/28/06 | 3/24/06<br>5/5/06<br>8/11/06 | $2,790.00<br>$2,250.00<br>$2,520.00 |
| 75 | 3/29/06 | ML | 3/26/06-4/9/06 | 4/24/06<br>5/11/06 | 3/1/06-3/25/06<br>4/1/06-4/9/06 | 5/5/06<br>5/26/06 | $540.00<br>$810.00 |
| 76 | 1/3/06 | CM | 12/29/05-1/29/06 | 2/10/06<br>2/10/06 | 12/29/05-12/31/05<br>1/1/06-1/29/06 | 2/24/06<br>2/24/06 | $1,073.01<br>$10,372.43 |
| 77 | 1/30/06 | CM | 1/30/06-4/30/06 | 3/7/06<br>3/7/06<br>6/12/06 | 1/30/06-1/31/06<br>2/1/06-2/28/06<br>3/1/06-3/28/06 | 3/17/06<br>3/17/06<br>6/23/06 | $715.34<br>$10,014.76<br>$9,657.09 |
| 78 | 11/8/05 | NM | 11/3/05-1/31/06 | 12/12/05<br>1/18/06<br>2/28/06 | 11/3/05-11/30/05<br>12/1/05-12/31/05<br>1/1/06-1/31/06 | 12/30/05<br>1/27/06<br>3/10/06 | $10,014.76<br>$11,087.77<br>$11,087.77 |
| 79 | 8/11/06 | NM | 8/3/06-10/1/06 | 9/13/06<br>10/6/06<br>11/9/06 | 8/3/06-8/31/06<br>9/1/06-9/30/06<br>10/1/06-10/1/06 | 9/22/06<br>10/20/06<br>11/24/06 | $10,932.42<br>$11,309/40<br>$376.98 |
| 80 | 10/17/06 | NM | 10/2/06-10/3/06 | 11/9/06 | 10/2/06-10/3/06 | 11/24/06 | $753.96 |
| 81 | 11/14/05 | KN | 11/15/05-12/15/05 | 1/17/06 | 12/1/05-12/31/05 | 1/27/06 | $11,087.77 |
| 82 | 12/16/05 | KN | 12/15/05-3/16/06 | 3/27/06<br>3/27/06<br>4/24/06 | 1/1/06-1/31/06<br>2/1/06-2/28/06<br>3/1/06-3/16/06 | 4/7/06<br>4/7/06<br>5/5/06 | $11,087.77<br>$10,014.76<br>$5,722.72 |
| 83 | 3/17/06 | KN | 3/17/06-4/12/06 | 4/24/06<br>5/11/06 | 3/17/06-3/31/06<br>4/1/06-4/30/06 | 5/5/06<br>5/26/06 | $5,365.05<br>$10,730.10 |
| 84 | 4/17/06 | KN | 4/13/06-6/5/06 | 6/8/06<br>7/31/06 | 5/1/06-5/31/06<br>6/1/06-6/5/06 | 6/23/06<br>8/11/06 | $11,087.77<br>$1,788.35 |
| 85 | 6/16/06<br>8/4/06 | KN | 6/9/06-7/4/06 | 7/31/06<br>9/1/06 | 6/1/06-6/5/06<br>6/9/06-6/30/06 | 8/11/06<br>9/15/06 | $1,073.01<br>$1,980.00 |

| Par | Date | Child | Confinement Dates Authorized | Date Claim Presented | Dates of Service of False Claim | Date Paid | Amount Paid |
|---|---|---|---|---|---|---|---|
| 86 | 2/1/06 | RR | 1/28/06-4/28/06 | 2/28/06 | 1/28/06-1/31/06 | 3/10/06 | $1,430.68 |
| | | | | 3/7/06 | 2/1/06-2/28/06 | 3/17/06 | $10,014.76 |
| | | | | 4/24/06 | 3/1/06-3/31/06 | 5/5/06 | $11,087.77 |
| | | | | 10/2/06 | 4/1/06-4/28/06 | 10/13/06 | $9,657.09 |
| 87 | 12/5/05 | PR-J | 12/2/05-2/28/06 | 3/7/06 | 2/1/06-2/28/06 | 3/17/06 | $10,014.76 |
| | | | | 3/27/06 | 12/2/05-12/31/05 | 4/7/06 | $10,730.10 |
| | | | | 3/27/06 | 1/1/06-1/31/06 | 4/7/06 | $11,087.77 |
| 88 | 12/9/05 | Ro.St. | 12/10/05-2/10/06 | 1/17/06 | 12/1/05-12/31/05 | 1/27/06 | $11,087.77 |
| | 12/15/05 | | | 2/10/06 | 1/1/06-1/31/06 | 2/24/06 | $11,087.77 |
| | | | | 3/7/06 | 2/1/06-2/10/06 | 3/17/06 | $3,576.70 |
| 89 | 2/10/06 | Ro.St. | 2/11/06-5/11/06 | 3/14/06 | 2/11/06-2/28/06 | 3/24/06 | $6,438.06 |
| | | | | 4/24/06 | 3/1/06-3/31/06 | 5/5/06 | $11,087.77 |
| | | | | 5/11/06 | 4/1/06-4/30/06 | 5/26/06 | $10,730.10 |
| 90 | 5/17/06 | Ro.St. | 5/12/06-6/29/06 | 6/8/06 | 5/1/06-5/31/06 | 6/23/06 | $11,087.77 |
| 91 | 2/17/06 | MT | 2/17/06-5/17/06 | 3/7/06 | 2/17/06-2/28/06 | 3/17/06 | $4,292.04 |
| | | | | 4/24/06 | 3/1/06-3/31/06 | 5/5/06 | $11,087.77 |
| | | | | 5/11/06 | 4/1/06-4/30/06 | 5/26/06 | $10,730.10 |
| | | | | 6/8/06 | 5/1/06-5/17/06 | 6/23/06 | $6,080.39 |
| 92 | 6/2/06 | MT | 6/19/06-9/19/06 | 8/14/06 | 5/18/06-5/31/06 | 8/25/06 | $4,292.04 |
| | | | | 9/13/06 | 6/19/06-6/30/06 | 8/25/06 | $4,292.04 |
| | | | | 8/21/06 | 7/1/06-7/31/06 | 9/1/06 | $11,636.08 |
| | | | | 9/13/06 | 8/1/06-8/31/06 | 9/22/06 | $11,636.08 |
| | | | | 10/6/06 | 9/1/06-9/16/06 | 10/20/06 | $6,031.68 |
| | | | | 2/26/07 | 9/17/06-9/19/06 | 3/9/07 | $1,130.94 |

## COUNT ONE
### Violations of the False Claims Act – False Records or Statements
### (31 U.S.C. § 3729(a)(1)(B))

93.     The United States incorporates by reference paragraphs 1 through 92 above as if fully set forth in Count One.

94.     The United States seeks relief against Defendants under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), which imposes civil liability against:

> (a)(1) . . . any person who—. . . (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

A person who violates these FCA provisions is "liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000,[3] plus 3 times the amount of damages which the Government sustains because of the act of that person . . . ."

95.     Between approximately October 2005 and an unknown date on or before approximately March 2, 2010, Defendants knowingly made, used, or caused to be made or used, false records or statements, including those described in paragraphs 28, 30, 32, and 34 through 92 of this Amended Complaint to obtain prior authorization from DMAS contractors WVMI or KePRO, for the continued confinement of Medicaid children at MYC, that were material to false or fraudulent claims.

96.      As a result of this conduct, Defendants caused the United States to suffer actual damages in an amount to be determined at trial.

## COUNT TWO
### Violations of the False Claims Act – False or Fraudulent Claims
### (31 U.S.C. § 3729(a)(1))

97.     The United States incorporates by reference paragraphs 1 through 92 above as if fully set forth in Count Two.

98.     The United States seeks relief against Defendants under the False Claims Act, 31 U.S.C. § 3729(a)(1), which imposes civil liability against:

> (a) . . . Any person who—(1) Knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval . . . .

---

[3] The amounts were increased by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410), for violations occurring on or after September 29, 1999.

A person who violates this provision is "liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000,[1] plus 3 times the amount of damages which the Government sustains because of the act of that person . . . ."

99.     Between approximately October 2005 and an unknown date on or before approximately March 2, 2010, as described in paragraphs 1 through 92 of this Amended Complaint, Defendants knowingly presented, or caused to be presented, to the United States false or fraudulent claims for payment or approval including, but not limited to, those  described in paragraphs 28, 30, 32, and 34 through 92 of this Amended Complaint.

100.    As a result of this conduct, Defendants caused the United States to suffer actual damages in an amount to be determined at trial.

## COUNT THREE
### Violations of the Virginia Fraud Against Taxpayers Act – False Records or Statements
### (Va. Code Ann. § 8.01-216.3(A)(2))

101.    The Commonwealth incorporates by reference paragraphs 1 through 92 above as if fully set forth in Count Three.

102.    The Commonwealth seeks relief against Defendants under the Virginia Fraud Against Taxpayers Act, 8.01-216.3(A)(2), which states:

A.  Any person who:

1.      Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth;

. . . shall be liable to the Commonwealth for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages sustained by the Commonwealth.

---

[1] The amounts were increased by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410), for violations occurring on or after September 29, 1999.

Va. Code Ann. § 8.01-216.3.  For violations occurring prior to July 1, 2007, the civil penalties

are not less than $5,000 and not more than $10,000.

103.    Between approximately October 2005 and an unknown date on or before

approximately March 2, 2010, as described in paragraphs 1 through 92 of this Amended

Complaint, Defendants knowingly made, used, or caused to be made or used, false records or

statements, including, but not limited to, those described in paragraphs 28, 30, 32, and 34

through 92 of this Amended Complaint to obtain prior authorization from WVMI or KePRO for

the continued confinement of Medicaid children at MYC, to get false or fraudulent claims paid

or approved for payment by the VMAP.

104.    As a result of this conduct, Defendants caused the Commonwealth to suffer actual

damages in an amount to be determined at trial.

## COUNT FOUR
**Violations of the Virginia Fraud Against Taxpayers Act – False or Fraudulent Claims**
**(Va. Code Ann. § 8.01-216.3(A)(1))**

105.    The Commonwealth incorporates by reference paragraphs 1 through 92 above as

if fully set forth in Count Four.

106.    The Commonwealth seeks relief against Defendants under the Virginia Fraud

Against Taxpayers, Va. Code Ann. § 8.0-216.3(A)(1), which states:

A.  Any person who:

2.       Knowingly presents, or causes to be presented, to an officer or
employee of the Commonwealth a false or fraudulent claim for
payment or approval . . .

  . . . shall be liable to the Commonwealth for a civil penalty of not less
than $5,500 and not more than $11,000, plus three times the amount of
damages sustained by the Commonwealth.

25

Va. Code Ann. § 8.01-216.3.  For violations occurring prior to July 1, 2007, the civil penalties

are not less than $5,000 and not more than $10,000.

107.     Between approximately October 2005, and an unknown date on or before

approximately March 2, 2010, as described paragraphs 1 through 92 of this Amended Complaint,

Defendants knowingly presented, or caused to be presented, to DMAS, claims that were false or

fraudulent including, but not limited to, those described in paragraphs 28, 30, 32, and 34 through

92 of this Amended Complaint.

108.      As a result of this conduct, Defendants caused the Commonwealth to suffer

actual damages in an amount to be determined at trial.

**COUNT FIVE**
**Violation of Virginia Fraud Statute**
**(Va. Code §§ 32.1-312(A)(1) and (2))**

109.     The Commonwealth incorporates by reference paragraphs 1 through 92 above as

if fully set forth in Count Five.

110.     The Commonwealth seeks relief against Defendants under the Virginia Fraud

Statute, Va. Code Ann. § 32.1 – 312, which states, in part:

> A. No person, agency or institution, . . . shall obtain or attempt to obtain
> benefits or payments where the Commonwealth directly or indirectly
> provides any portion of the benefits or payments pursuant to the Plan for
> Medical Assistance and any amendments thereto as provided for in § 32.1-
> 325, hereafter referred to as "medical assistance" in a greater amount than
> that to which entitled by means of:
>
> 1.      A willfull false statement;
>
> 2.      By willful misrepresentation, or by willful concealment of
> any material facts. . . .
>
> B. Any person, agency or institution knowingly violating any of the
> provisions of subsection A of this section shall be liable for repayment of
> any excess benefits or payments received, plus interest on the amount of

the excess benefits or payments at the rate of 1 1/2 percent each month for the period from the date upon which payment was made to the date upon which repayment is made to the Commonwealth. Such person, agency or institution, in addition to any other penalties provided by law, shall be subject to civil penalties.

111.    Between approximately October 2005 and an unknown date on or before approximately March 2, 2010, Defendants obtained or attempted to obtain payments from DMAS by means of willful false statements, and/or willful misrepresentations of fact or by willful concealment of material facts, to obtain prior authorization for the continued confinement of Medicaid children at MYC.

112.    The Commonwealth made substantial payments of money in reimbursement of Medicaid claims in justifiable reliance upon the defendants' false statements and/or willful misrepresentations or willful concealment of material facts.

113.    As a result of this conduct, Defendants caused the Commonwealth to suffer actual damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, the United States of America and the Commonwealth of Virginia, pray judgment be entered in their favor and against Defendants as follows:

1.    The Court order, pursuant to Counts One and Two, that Defendants pay the United States triple the amount of its damages to be determined, plus civil penalties of up to $11,000 for each false claim; for all costs of this civil action; and for such other and further relief as the Court deems just and equitable;

2.    The Court order, pursuant to Counts Three and Four, that Defendants pay the Commonwealth triple the amount of its damages to be determined, plus civil penalties of up to $10,000 for each false claim presented before July 1, 2007, and $11,000 for each false claim

27

presented on or after July 1, 2007; for all costs of this civil action; and for such other and further relief as the Court deems just and equitable;

3.    The Court order, pursuant to Count Five that Defendants pay the amount of damages to the Commonwealth, prejudgment interest, plus fees and costs;

4.    The Court award such other and further relief as is just, equitable and proper; and

5.    A Jury Trial is Requested.

DATED:  November 5, 2010.

UNITED STATES OF AMERICA:

TONY WEST
Assistant Attorney General
Civil Division

TIMOTHY J. HEAPHY
United States Attorney
Western District of Virginia

/s/ Rick A. Mountcastle
Rick A. Mountcastle, VSB #19768
Assistant United States Attorneys
P.O. Box 1709
Roanoke, VA  24008-1709
540/857-2254; 540/857-2283 (fax)


 /s/ Brian J. McCabe
Joyce R. Branda
Renee Brooker
Brian J. McCabe, VSB #41693
Attorneys, Civil Division
U.S. Department of Justice
P.O. Box 261, Ben Franklin Station
(202) 616-4875; (202) 514-0280 (fax)


COMMONWEALTH OF VIRGINIA:

/s/ Erica J. Bailey
Erica J. Bailey, VSB #68202
Assistant Attorney General
Office of the Attorney General
900 East Main Street
Richmond, VA  23219
804/786-2452