# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ET AL., EX REL. MEGAN L. JOHNSON, ET AL., | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:07CV00054 |
| v. | ) ) | **OPINION AND ORDER** |
| UNIVERSAL HEALTH SERVICES, INC., ET AL., | ) ) ) ) | By: James P. Jones United States District Judge |
| Defendants. | ) | |

*Mark T. Hurt, The Law Offices of Mark T. Hurt, Abingdon, Virginia, and Daniel R. Bieger, Copeland & Bieger, PC, Abingdon, Virginia, for Relators; Rick Mountcastle and Daniel Bubar, Assistant United States Attorneys, Roanoke, Virginia, and Brian J. McCabe, Attorney, U.S. Department of Justice, Civil Division, Washington, D.C., for United States; and Megan L. Holt, Assistant Attorney General of Virginia, Richmond, Virginia, for Commonwealth of Virginia.*

The government has settled this False Claims Act case but cannot agree as to the proper percentage of the settlement amount to be awarded to the relators – the persons who originally filed the action and brought the alleged fraud to the government's attention. After hearing evidence and argument of counsel, I now resolve the issue and will award twenty percent of the recovery to the relators.

I.      Procedural Background.

The relators in this case, Megan L. Johnson, Leslie L. Webb, and Kimberly Stafford-Payne, are three former employees of the Keystone Marion Youth Center ("Youth Center"), a residential treatment center for boys suffering from serious mental health and behavioral issues. The Youth Center was operated by Keystone Education and Youth Services, LLC ("Keystone"), a wholly-owned subsidiary of Universal Health Services, Inc. ("UHS"). During the course of their employment, from December 2004 through August 2006, the relators came to believe that Keystone was filing a number of false claims to Medicaid for medical treatment and psychiatric services that the Youth Center had not in good faith rendered. On July 16, 2007, the relators filed a *qui tam* action naming as defendants, among others, Keystone and UHS. The action alleged claims under the False Claims Act ("FCA"), 31 U.S.C.A. §§ 3729-3733 (West 2003 & Supp. 2012), and the Virginia Fraud Against Taxpayers Act ("VFATA"), Va. Code Ann. §8.01-216.1-216.19 (2007 & Supp. 2012), as well as a number of employment-related torts. The United States and the Commonwealth of Virginia conducted investigations and both chose to intervene.[1] Following extensive discovery, the parties reached a

---

[1] For convenience, I will refer to the United States and the Commonwealth of Virginia collectively as the "government" and will also refer to the separate federal and state causes of action collectively as the "FCA claims."

global settlement agreement in which the defendants agreed to pay $6,850,000 to the government.[2] The case is now before me to determine the share of the settlement proceeds that should be paid to the relators.[3]

An evidentiary hearing was held to determine the facts underlying the question of the appropriate share for the relators. The parties presented no testimony, but they did offer written declarations from the parties and their attorneys, depositions, and various other documents as evidence of the manner in which the case proceeded.

The relators contend they should receive twenty-four percent of the government's recovery. The relators submit that they provided the government with critical information about the fraud in pre-filing disclosures and in subsequent interviews with the government. The government did not know of the fraud at the Youth Center prior to the relators' decision to disclose. Furthermore, the relators argue that they participated in and contributed to the prosecution of the action by attending nearly all depositions and hearings in the case, by consistently conferring with counsel for the government and by submitting briefs in support of the government during motions practice. Moreover, the relators argue that their

---

[2] It is represented that the United States will receive forty percent of the proceeds and the Commonwealth of Virginia sixty percent, less the relators' share.

[3] The relators have further represented that they intend to share equally the portion of the settlement awarded to them. I do not believe this disposition is unwarranted given the facts as they have been presented.

counsel suggested the use and secured the participation of an important expert who provided information that substantially increased the potential liability of the defendants and encouraged the defendants to settle more quickly. Finally, the relators argue that they made substantial sacrifices in support of the government's claim, including agreeing to reduce the amount of damages they requested in satisfaction of their individual tort claims in order to facilitate a global settlement. The relators argue that these sacrifices, as well as the physical and emotional harm they suffered as a result of prosecuting the claim, when added to their substantial contributions to the prosecution of the action, warrant a twenty-four percent share.

In response, the government contends the relators should receive only a seventeen percent share of the government's recovery. The government argues that the relators could only provide direct information during the time of their employment at the Youth Center, requiring the government to conduct its own extensive investigation to uncover the temporal extent of the fraud. Moreover, the relators lacked specific knowledge and information pertinent to the filing of claims by the defendants with Medicaid, and had no information tying UHS, the primary source of recovery funds, to the fraud. The government further minimizes the relators' involvement following the government's decision to intervene in the case, arguing the responsibility for discovery requests and conducting depositions with regard to the FCA claims fell on the government. Finally, the government argues

that a seventeen percent recovery is sufficient to protect Congress's intent to promote the reporting of fraud committed against the government.

II.     Applicable Law.

The False Claims Act, as amended in 1986, provides that relators of ultimately successful claims in which the government chose to intervene are entitled to receive fifteen to twenty-five percent of any settlement or judgment the government recovers. 31 U.S.C.A. §3730(d)(1). The Act provides that the amount the relator should receive depends upon "the extent to which the person substantially contributed to the prosecution of the action." *Id.* The language of the VFATA directly parallels the FCA, specifically with regard to determining the relator's share of a judgment or settlement.[4] Although no Virginia courts have issued decisions interpreting this portion of the VFATA to date, the similarity of the language of the two statutes makes it clear that the Virginia General Assembly intended to pattern the VFATA after the FCA. I will, therefore, apply the same analysis to both statutes.

---

[4] The VFATA reads, in relevant part, "[I]f the Commonwealth proceeds with an action brought by a person under § 8.01-216.5, such person shall receive at least fifteen percent but not more than twenty-five percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action." Va. Code Ann. §8.01-216.7(A).

The fifteen percent award specified in the FCA has generally been regarded as a finder's fee to which the relators are entitled even if their only involvement in the suit was merely to file the action. *See United States ex rel. Alderson v. Quorum Health Grp.*, 171 F. Supp. 2d 1323, 1331 (M.D. Fla. 2001). It is noted that "[p]ercentage awards above the statutory 15% take into account whatever information, work, and help of any kind the relator provides, apart from the mere filing of the action, that leads to a recovery by the Government and substantially contributes to the prosecution of the case without harming the Government's efforts." *United States ex rel. Shea v. Verizon Commc'ns, Inc.*, 844 F. Supp. 2d 78, 81 (D.D.C. 2012). The relators bear the burden of proving that their contribution to the case warrants more than a fifteen percent share of the recovery. *United States ex rel. Marchese v. Cell Therapeutics, Inc.*, No. CV06-0168MJP, 2007 WL 4410255, at *7 (W.D. Wash. Dec. 14, 2007).

The FCA itself provides little guidance with regard to implementing this standard, leaving district courts with great discretion in determining the relators' share. *Id.* Courts have looked to the legislative history of the FCA, as well as to the Department of Justice's "Relator's Share Guidelines" ("DOJ Guidelines" or "Guidelines") for direction in determining the appropriate factors to consider. Although these sources are not binding on the court, they provide an instructive paradigm with which to analyze the question.

A.  Legislative History.

The first piece of legislative history that a few courts have considered is a statement on the floor of the House of Representatives detailing the history and motivations underlying consideration of the 1986 amendments to the FCA. *See, e.g., United States ex rel. Johnson-Pochardt v. Rapid City Reg'l Hosp.*, 252 F. Supp. 2d 892, 897 (D.S.D. 2003); *Alderson*, 171 F. Supp. 2d at 1332. Rep. Berman stated, "In those cases where the person carefully develops all the facts and supporting documentation necessary to make the case and presents it in a thorough and detailed fashion . . . and where that person continues to play an active and constructive role . . . the Court should award a percentage substantially above 15% and up to 25%." 132 Cong. Rec. H9382-03 (1986). This standard is in contrast to a relator who merely files a claim and then allows the government to handle the entire burden of prosecution, a situation that would only entitle the relator to the minimum recovery. *See United States ex rel. Burr v. Blue Cross & Blue Shield of Fla., Inc.*, 882 F. Supp. 166, 168 (M.D. Fla. 1995). The court in *Burr* emphasized that "the maximum recovery is reserved for situations where the relator actively and uniquely aids the government in the prosecution of the case." *Id.*

In addition to the legislative history in the House, the legislative history in the Senate has also provided courts with factors to consider in determining the

appropriate relators' share of a settlement or judgment. In its report recommending that the Senate adopt the 1986 amendments to the FCA, the Senate Judiciary Committee identified three factors of particular importance. S. Rep. No. 99-345, at 28 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5293. These factors ("the Senate factors") included (1) the significance of the information provided to the government, (2) the contribution of the person who brought the action to the results obtained, and (3) whether the information which formed the basis of the suit was known to the government before the suit was filed.

A number of courts have looked to the Senate factors in addressing the question of the appropriate relators' share. *See, e.g., United States ex rel. Rille v. Hewlett-Packard Co.*, 784 F. Supp. 2d 1097, 1100 (E.D. Ark. 2011); *Shea*, 844 F. Supp. 2d. at 82-83; *Alderson*, 171 F. Supp. 2d at 1332-1333. The court in *Shea* focused on the "significance" of the information the relator provided and the "contribution" of the relator to the results obtained. In *Shea*, the relator's original complaint identified the basis for more than eighty percent of the amount the government ultimately recovered. Moreover, the claim was complex and the relator was able to bring a substantial amount of expertise -- eighteen years as an executive and consultant in the industry -- to bear in assisting the prosecution of the case. Finally, not only was the relator's claim previously unknown, but the government would also not likely have discovered it for many years had the relator

not reported it. The relator's information was, therefore, significant and his contribution to the prosecution of the claim was invaluable, warranting a twenty percent share of the government's recovery.

The court in *Alderson* similarly focused on the nature of the relator's contribution to the prosecution of the action. The relator in the case hired experienced *qui tam* counsel to assist him in convincing the government to maintain its involvement in the case. Twice the government indicated its intention to decline to get involved. But for the realtor's unflagging efforts, the claim would not have gone forward and no recovery would have resulted to the government. The relator's contribution, therefore, was substantial and warranted a twenty-four percent share of the $85.7 million recovery. *Alderson*, 171 F. Supp. 2d at 1332-1333.

Finally, the court in *Johnson-Pochardt* also focused on the Senate factors. 252 F. Supp. 2d at 897-899. In this case, a hospital administrator filed a *qui tam* suit accusing her employer of violating the law through a number of unfair business practices. In filing her action and cooperating with the government, the relator provided thousands of documents, including the suspect lease agreement underlying the claim, to government investigators. The relator completed a number of lengthy interviews with the government, lending her personal knowledge of the administrative procedures of the hospital to the investigation.

-9-

Case 1:07-cv-00054-JPJ-PMS   Document 345   Filed 09/05/12   Page 9 of 17   Pageid#: 3405

The court found all of these contributions, in addition to the substantial personal hardship the relator faced throughout the prosecution of the case, required a twenty-four percent share to reward the relator for "her valiant actions and [to] encourage other potential whistleblowers to take risks similar to those taken by [her] in this matter." *Id.* at 905 (internal quotation marks and citation omitted).

In this case, the Senate factors weigh in favor of an above-minimal recovery for the relators. First, the government had no knowledge of fraud at the Youth Center prior to the filing of suit by the relators. It is reasonable to assume that the fraud would have gone undetected for some additional time, at further cost both to the government and to the residents of the Youth Center. Second, the information the relators provided appears to have been significant. The relators, as front-line caregivers, were able to provide first hand descriptions of the treatment of the residents of the Youth Center, as well as details about the Youth Center's demands on individual therapists regarding billing and paperwork. In addition, it was the relators' attorney who suggested the use of an important expert, Dr. Thomas Belin, the information from whom may have assisted in motivating a settlement. This expert provided information substantially increasing the available recovery to the government and the case successfully settled within a few weeks of this information becoming available. The government does not dispute the fact that realtors' counsel suggested this expert and assisted in securing his participation,

-10-

although it denies that the expert's report was the catalyst for the ultimate settlement.

Other factors, however, do not substantially counsel in favor of relators. The relators may have reduced their demands on their individual claims in order to facilitate a global settlement agreement, but they did receive some satisfaction on their claims as a result of that same agreement.[5] It could not, therefore, have been so much of a sacrifice for the relators to make an agreement from which they directly benefited. The relators further point out that they gave up their statutory right to claim attorneys' fees in their *qui tam* action. It should be noted, however, that had the relators been awarded statutory attorneys' fees in this case, it is possible the court would have considered reducing the substantial contingent fee due under the agreement between relators and their counsel, based on its inherent supervisory authority over such fee contracts.

Finally, the relators did not have knowledge of the direct involvement of UHS in the fraud, which forced the government to pursue an extensive investigation and vigorous litigation of its own to prosecute the claim. Unlike the relator in *Shea*, the relators could not independently provide an overwhelming amount of the relevant information. Similarly, the government vigorously investigated and prosecuted this case so that the relators were not required to make

---

[5] Under the terms of the global settlement agreement, the amount the relators received in satisfaction of their individual claims has been kept confidential.

-11-

the same overwhelming outlay of individual energy and resources as the relator in *Alderson*, who received a twenty-four percent recovery. Their share, therefore, should be mitigated under the Senate factors.

B.   The DOJ Guidelines.

In addition to the legislative history, courts have consistently looked to the DOJ Guidelines to assist in determining the appropriate relators' share. The Guidelines indentify two sets of factors, one set counseling in favor of a larger relators' share[6] and one set that would reduce the relator's share.[7] *See* 11 *False*

---

[6] These factors include: (1) The relator reported the fraud promptly; (2) When he learned of the fraud, the relator tried to stop the fraud or reported it to a supervisor or the government; (3) The *qui tam* filing, or the ensuing investigation, caused the offender to halt the fraudulent practices; (4) The complaint warned the government of a significant safety issue; (5) The complaint exposed a nationwide practice; (6) The relator provided extensive, first-hand details of the fraud to the government; (7) The government had no knowledge of the fraud; (8) The relator provided substantial assistance during the investigation and/or pre-trial phases of the case; (9) At his deposition and/or trial, the relator was an excellent, credible witness; (10) The relator's counsel provided substantial assistance to the government; (11) The relator and his counsel supported and cooperated with the government during the entire proceeding; (12) The case went to trial; (13) The FCA recovery was relatively small; and (14) The filing of the complaint had a substantial adverse impact on the relator.

[7] These factors include: (1) The relator participated in the fraud; (2) The relator substantially delayed in reporting the fraud or filing the complaint; (3) The relator, or relator's counsel, violated FCA procedures: (a) complaint served on defendant or not filed under seal, (b) the relator publicized the case while it was under seal, (c) statement of material facts and evidence not provided; (4) The relator had little knowledge of the fraud or only suspicions; (5) The relator's knowledge was based primarily on public information; (6) The relator learned of the fraud in the course of his government employment; (7) The government already knew of the fraud; (8) The relator, or relator's

Case 1:07-cv-00054-JPJ-PMS   Document 345   Filed 09/05/12   Page 12 of 17   Pageid#: 3408

*Claims Act and Qui Tam Quarterly Review*, Oct. 1997, at 17-19. The DOJ Guidelines are internal standards, not federal regulations, and are therefore in no way binding on the analysis of the court. The Guidelines are, however, "well known among frequent FCA practitioners and apparently often are consulted by the government and relator's counsel in negotiating a relator's share." *Alderson*, 171 F. Supp. 2d at 1333. Moreover, the Guidelines identify a number of factors the court considers to be especially relevant in determining the appropriate relators' share in this case.

        1.    Factors Favoring a Larger Relators' Share.

Among the more important factors counseling in favor of a greater relators' share in this case is that the relators reported a fraud that was previously unknown to the government. Moreover, their complaint warned the government of a significant safety issue posed to the residents of the Youth Center who were not receiving the care they needed. In addition, as discussed above, the relators' counsel provided substantial assistance to the government by suggesting the use of an expert who provided information that appears to have encouraged settlement. When the relators found out about the troubles at their former employer, they did

---

counsel, did not provide any help after filing the complaint, hampered the government's efforts in developing the case, or unreasonably opposed the governments' position in litigation; (9) The case required a substantial effort by the government to develop the facts to win the lawsuit; (10) The case settled shortly after the complaint was filed or with little need for discovery; and (11) The FCA recovery was relatively large.

-13-

Case 1:07-cv-00054-JPJ-PMS   Document 345   Filed 09/05/12   Page 13 of 17   Pageid#: 3409

attempt to bring their concerns to the attention of their superiors at the Youth Center. Finally, the relators were able to lend some firsthand knowledge of the practices at the Youth Center to the government's investigation and they fully supported and cooperated with the government throughout the entire proceeding. All of these factors encourage a relators' share substantially above the statutory minimum.

Counsel have cited to other "favorable" factors in arguing for a more substantial recovery for the relators, but these factors do not provide substantial support to their argument. The relators have argued that their counsel lent significant assistance to the government in the course of prosecuting the FCA claim, specifically by participating in discovery depositions and filing briefs in support of the government. The relators, however, have not presented any evidence that these actions provided significant assistance to the government or mitigate the nature and extent of the resources the government had to expend in conducting its own investigation and litigation of the FCA claim. This factor, therefore, does not weigh heavily in favor of the relators.

The relators have also argued they suffered substantial pain and suffering as a result of filing their action, causing such an adverse impact that would warrant an increase in their share of the agreement. The relators specifically argue that the length of time the case was under seal caused them excessive stress and mental

anguish resulting in a substantial adverse impact. *Qui tam* suits, however, are frequently under seal for periods of months as the government determines whether it will seek to intervene. *See, e.g., Rille*, 784 F. Supp. 2d at 1098 (case under seal for thirty-one months); *United States ex rel. Fox v. Nw. Nephrology Assocs.*, 87 F. Supp. 2d 1103, 1104 (E.D. Wash. 2000) (case under seal for twenty-nine months). Although any litigation can be a stressful experience, the relators have not presented evidence of the kind of specific harm that would warrant an increased recovery. Unlike the relator in *Johnson-Pochardt*, 252 F. Supp. 2d at 895-897, the relators in this case did not continue to be employed by the defendant while the case was being investigated by the government. Moreover, the relators have not presented evidence of the kind of social and professional difficulties that the relator in *Johnson-Pochardt* experienced, such as an inability to find alternative comparable employment. The personal harm suffered by the relators in this case, therefore, does not encourage an increase in the relators' share.

### 2. Factors Counseling a Smaller Relators' Share.

The government has argued that a number of factors indicate that the relators should receive a smaller, seventeen percent share of the government's recovery. The government has also argued that the relators' knowledge of the fraud was limited. It is true that the relators could not provide any information connecting UHS to the fraud perpetrated at the Youth Center. The government had to expend

-15-

Case 1:07-cv-00054-JPJ-PMS   Document 345   Filed 09/05/12   Page 15 of 17   Pageid#: 3411

substantial resources investigating UHS and litigating the company's continued involvement after it was twice dismissed from the case. Moreover, the relators' period of employment at the Youth Center was short, which limited the time period for which they could provide relevant information to the government. The government had to independently investigate the additional forty-two month period of fraudulent conduct during which the relators were no longer employed at the Youth Center. The relators, therefore, provided what assistance they could to the government, but the case still required substantial effort by the government to develop the necessary facts to win the lawsuit. These factors indicate the relators should receive a smaller share than the maximum twenty-five percent.

The government has also pointed out that the case settled rather than proceeding to trial and therefore required less effort by the relators than might have been the case. Although this is true, the case did proceed through extensive discovery before the parties came to an agreement, a process in which the relators did take some part. Under the facts of this case, the settlement agreement does not helpfully inform the appropriate relators' share.

III.  Conclusion.

After fully considering the factors discussed above, I find that an appropriate amount of the settlement for the relators to share is twenty percent. That percentage adequately recognizes their contribution to the government's case, while also appropriately limits their recovery in light of the particular circumstances of this case.

Accordingly, it is **ORDERED** that Relators' Joint Motion for Relator Share Award (ECF No. 316) is GRANTED and the court directs that the relators share equally in a sum equal to twenty percent of the settlement amount of $6,850,000, which sum is $1,370,000.[8]

ENTER: September 5, 2012

/s/ James P. Jones
United States District Judge

---

[8] Following argument, the relators filed a Motion for Immediate Award of Statutory Minimum for Relator Share (ECF No. 342), but that motion is now moot.